**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **POLYINDEX, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 4:22-cv-00128 |
| —against— | § | |
| | § | Removed From: |
| **EULER HERMES NORTH AMERICA** | § | Fort Bend Cnty. 400th Jud. Dist. Ct. |
| **INSURANCE COMPANY,** | § | Cause No. 21-DCV-289656 |
| | § | |
| Defendant. | § | |

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF
DEFENDANT EULER HERMES NORTH AMERICA INSURANCE COMPANY**

Defendant Euler Hermes North America Insurance Company ("Euler"), by its

undersigned attorneys, upon removal to this Court, answering the "Original Petition" dated

December 14, 2021 of plaintiff Polyindex, LLC ("Polyindex"), and for its affirmative defenses

and counterclaims, avers as follows:

Answering the Petition

1.      Paragraph 1 of the Petition is inapplicable and no response is required; otherwise

denied.

2.      Euler lacks knowledge or information sufficient to form a belief about the truth of

the allegations of paragraph 2 of the Petition except admits, upon information and belief, that

Polyindex is a limited liability company that has been incorporated in and has its principal place

of business in the State of Texas.

3.      Euler denies the allegations of paragraph 3 of the Petition except admits that it has

been incorporated in and has its principal place of business the State of Maryland; that it is

licensed to do an insurance business in the State of Texas under the auspices of the Texas

Department of Insurance and that it does such business in the State of Texas; and that its registered agent for the service of process is CT Corporation System, 350 North Saint Paul Street, Dallas, Texas 75201; and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

4.     Paragraph 4 of the Petition is inapplicable in this Court upon removal; Euler is not required to respond to the allegations of said paragraph, which are purported statements and/or conclusions of law; otherwise denied.

5.     Paragraph 5 of the Petition is inapplicable in this Court upon removal; Euler is not required to respond to the allegations of said paragraph, which are purported statements and/or conclusions of law. Euler admits that it is subject to personal jurisdiction in the State of Texas in connection with the claims made in this action, that the claims and counterclaims in this action arise from an insurance contract between Euler and Polyindex, which, upon information and belief, is "a Texas resident"; otherwise denied.

6.     Paragraph 6 of the petition (regarding venue) is inapplicable in this Court upon removal; Euler is not required to respond to the allegations of said paragraph, which are purported statements and/or conclusions of law; otherwise denied.

7.     Paragraph 7 of the Petition violates Fed. R. Civ. P. 8(d) and 10(b) in that its allegations are not simple, concise, and direct and is not limited to a single set of circumstances. Responding to paragraph 7 of the Petition, Euler admits, upon information and belief, that Polyindex represents itself as a U.S.-based chemical/resin broker that sells chemical/resin all over the world, that Polyindex applied for and accepted a certain policy of trade credit insurance issued by Euler called a "Corporate Advantage Policy," designated as Policy No. 5127814 (the

"**Policy**") (a copy of which is annexed), which Euler incorporates by reference and which defines the terms and conditions of coverage; otherwise denied.

8.     Paragraph 8 of the Petition violates Fed. R. Civ. P. 8(d) and 10(b) in that its allegations are not simple, concise, and direct and is not limited to a single set of circumstances. Euler lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 8 of the Petition.

9.     Paragraph 9 of the Petition violates Fed. R. Civ. P. 8(d) and 10(b) in that its allegations are not simple, concise, and direct and is not limited to a single set of circumstances. Euler denies the allegations of paragraph 9 of the petition as to it; refers to the **Policy** (including endorsements) for a statement of its terms and conditions of coverage; and lacks knowledge or information sufficient to form a belief about the truth of any other allegations of said paragraph.

10.     Paragraph 10 of the Petition violates Fed. R. Civ. P. 8(d) and 10(b) in that its allegations are not simple, concise, and direct and is not limited to a single set of circumstances. Euler lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 10 of the Petition.

11.     Paragraph 11 of the Petition violates Fed. R. Civ. P. 8(d) and 10(b) in that its allegations are not simple, concise, and direct and is not limited to a single set of circumstances. Responding to paragraph 11 of the Petition, Euler refers to the documents Polyindex submitted to Euler on or about January 13, 2021 (without admitting the truth of their content or their completeness or that they constituted all the pertinent and required documents); admits that Euler, through Ron Kelly and others, duly and timely notified Polyindex of the denial of its claim under the **Policy**; otherwise denied.

12.     Responding to paragraph 12 of the Petition, Euler lacks knowledge or information sufficient to form a belief about the truth of the allegations of said paragraph as to what Polyindex relied upon (without admitting that any such reliance was reasonable or justified); denies that Euler had any duty, under the *Policy* or otherwise, "to uncover and preempt any fraudulent transactions" in connection with Polyindex's course of dealing with someone engaging in identity theft; refers to the *Policy* including endorsements for a statement of its terms, coverages and exclusions, which include an affirmative obligation on the part of Polyindex to ensure that the entity that it invoiced for the goods as "the *Buyer* named in [the] *Permitted Limit*" was the same entity to which it "*Supplied*" the goods in Mombasa, Kenya. *See* Policy Form § B ("Managing your *Policy*") (7) ("Your *Permitted Limits*") (7.1) ("Setting your *Permitted Limits*") (e); § E ("Definitions under your *Policy*") (at p. 12). Whoever the goods were shipped to in Mombasa, it was *not* the *Buyer* under the *Policy*.[1]

13.     Responding to paragraph 13 of the Petition (incorporating prior allegations), Euler incorporates by reference its responses above to the paragraphs of the Petition referred to.

14.     Responding to paragraph 14 of the Petition, Euler admits that Polyindex had an insurance contract with Euler, to wit, the *Policy*, to which Euler refers for a statement of its terms and conditions of coverage and denies any other allegations of said paragraph.

15.     Euler denies the allegations of paragraph 15 of the Petition.

16.     Euler denies the allegations of paragraph 16 of the Petition.

---

[1]Polyindex's allegation that "[a]ccording to the policy and its endorsements there are no exclusions regarding possible fraudulent transactions" is misleading in that the *insuring agreement* of the *Policy* does not cover fraudulent transactions, irrespective of any exclusion.

-4-

17.    Euler denies the allegations of paragraph 17 of the Petition or that Polyindex is entitled to any award of damages or any other relief claimed in the Petition.

18.    Euler denies the allegations of paragraph 18 of the Petition or that Polyindex is entitled to attorney's fees or any other relief claimed in the Petition.

19.    Responding to paragraph 19 of the Petition (incorporating prior allegations), Euler incorporates by reference its responses above to the paragraphs of the Petition referred to.

20.    Euler denies the allegations of paragraph 20 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

21.    Euler denies the allegations of paragraph 21 of the Petition, refers to the ***Policy*** for a statement of its terms and conditions of coverage; and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

22.    Paragraph 22 of the Petition violates Fed. R. Civ. P. 8(d) and 10(b) in that its allegations are not simple, concise, and direct and is not limited to a single set of circumstances. Euler denies the allegations of paragraph 22 of the Petition and the subparagraphs thereof.

23.    Euler denies the allegations of paragraph 23 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

24.    Euler denies the allegations of paragraph 24 of the Petition.

25.    Euler denies the allegations of paragraph 25 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

26.    Responding to paragraph 26 of the Petition (incorporating prior allegations), Euler incorporates by reference its responses above to the paragraphs of the Petition referred to.

27.    Euler denies the allegations of paragraph 27 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

28.    Euler denies the allegations of paragraph 28 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

29.    Euler denies the allegations of paragraph 29 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

30.    Responding to paragraph 30 of the Petition (incorporating prior allegations), Euler incorporates by reference its responses above to the paragraphs of the Petition referred to.

31.    Euler denies the allegations of paragraph 31 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

32.    Paragraph 32 of the Petition violates Fed. R. Civ. P. 8(d) and 10(b) in that its allegations are not simple, concise, and direct and is not limited to a single set of circumstances. Euler denies the allegations of paragraph 32 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

33.    Euler denies the allegations of paragraph 33 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

34.    Responding to paragraph 34 of the Petition (incorporating prior allegations), Euler incorporates by reference its responses above to the paragraphs of the Petition referred to.

35.    Euler denies the allegations of paragraph 35 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

36.    Responding to paragraph 36 of the Petition (incorporating prior allegations), Euler incorporates by reference its responses above to the paragraphs of the Petition referred to.

37.    Euler denies the allegations of paragraph 37 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

38.     Responding to paragraph 38 of the Petition (incorporating prior allegations), Euler incorporates by reference its responses above to the paragraphs of the Petition referred to.

39.     Euler denies the allegations of paragraph 39 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

40.     Responding to paragraph 40 of the Petition (incorporating prior allegations), Euler incorporates by reference its responses above to the paragraphs of the Petition referred to.

41.     Euler denies the allegations of paragraph 41 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

42.      Euler denies the allegations of paragraph 42 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

43.     Euler denies the allegations of paragraph 43 of the Petition and is not required to respond to the purported statements and/or conclusions of law in said paragraph.

44.     Euler denies the allegations of paragraph 44 of the Petition and refers to its defenses and counterclaim below regarding conditions of coverage under the Policy.

45.     Paragraph 45 of the Petition is inapplicable and Euler is not required to respond to the purported statements of law and procedure in said paragraph.

Affirmative Defenses

1.     The Petition fails to state a claim upon which relief can be granted.

2.     Polyindex's claims are barred by the unambiguous terms and conditions of the *Policy*, which is an integrated agreement.

3.     The *Policy* (or credit insurance generally) does not cover fraud or illegality, upon which Polyindex's claim is based.

4.     Polyindex's claims are barred by the statute of frauds.

5.      The Policy provides:

> These General Terms and Conditions, your Application, any
> Endorsements, and the **Special Terms** issued to you shall comprise
> the **Policy** of insurance issued to you [Polyindex] and these
> integrate the entire understanding of the parties as to the subject
> matter. This **Policy** shall be considered to have been issued and
> accepted upon mutually agreed terms and conditions once you pay
> the initial premium and no coverage shall be in effect prior to such
> payment. The **Policy** shall be binding on us only if this **Policy** form
> and Endorsements bear the signatures of the President and
> Secretary of the company. No sales agent, broker or other person is
> authorized to change or waive any of the provisions of the **Policy**
> nor is any notice to any sales agent or broker deemed notice to the
> company. Any change to the **Policy** or waiver of any provision
> must be in writing bearing the signatures of the President and
> Secretary to be effective. Further, you may not rely on any
> representations or promises that are not expressly contained in the
> **Policy** in accepting the **Policy**.

Policy Form §D ("General conditions") (24) ("*Policy* authentication") (at p. 10).

6.      Under the **Policy**, on its part, Polyindex was affirmatively responsible for
ensuring that Hammond Chemicals Limited, as "the **Buyer** named in [Euler's] **Permitted Limit**,"
was "the same legal entity to which [Polyindex] invoice[d] the goods" as the entity to which it
"**Supplied**" such goods. Policy Form § B ("Managing your *Policy*") (7) ("Your *Permitted
Limits*") (7.1) ("Setting your *Permitted Limits*") (e); § E ("Definitions under your *Policy*") (at p.
12). Polyindex failed to ensure that the **Buyer**, Hammond Chemicals Limited, was the same legal
entity Polyindex invoiced for the goods and the same legal entity to which it **Supplied** such
goods.  Polyindex **Supplied** the goods to someone else, thus breaching the **Policy**. Polyindex's
claims are barred by its own failure to ensure the foregoing and to take reasonable steps to
confirm the bona fides of the person or entity with which it dealt in connection with the subject
transactions.

7.      The claims of Polyindex are barred by contributory negligence.

-8-

8.    The **Policy** provides that "a receivable resulting from goods or services **Supplied** is not insured in the following circumstances," among others: "If the obligation to pay the receivable . . . [h]as been **Disputed** by the **Buyer**." Policy Form § A ("Scope of your **Policy**") (4) ("Uninsured receivable") (4.1(c)).[2]

9.    Polyindex's receivable has been **Disputed** by Hammond Chemicals Limited, *i.e.*, it has refused to pay Polyindex all or any part of any receivables reflected in the invoice and has disavowed any obligation to do so, and therefore, the receivable represented by the invoice is not insured under, and excluded by, the **Policy**.

10.    Polyindex's claims are barred by waiver, estoppel and/or ratification.

11.    Euler did not "knowingly" commit any act proscribed by the Texas Insurance Code in connection with the **Policy** or Polyindex's claim thereunder, as that term is defined in Section 541.002(1) of Subchapter A, Chapter 541, Subtitle C of Title 15 of the Texas Insurance Code.

12.    The claims of Polyindex for attorney fees under Texas Civil Practice and Remedies Code Chapter 38 should not be allowed as said statute does not authorize the recovery of attorney fees by limited liability companies, which is the entity type of Polyindex.

<u>Counterclaims for Declaratory and Other Relief</u>

1.    Following are counterclaims for declaratory and other relief under the Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and under the Texas Uniform

---

[2]"**'Dispute'/'Disputed'** means any unresolved disagreement between [the insured] and a **Buyer** that results in the **Buyer** refusing to pay [the insured] all or part of any receivables." Policy Form § E ("Definitions under your **Policy**") (at p. 11). This remains unless and until "the **Buyer**'s liability is established by agreement in writing or by a final binding court judgment or arbitration award" and the "court judgment must be obtained in a jurisdiction in which the **Buyer** has a majority of its assets." *Id*.

Declaratory Judgments Act, Title 2, Subtitle C, Chapter 37 of the Texas Practice & Remedies Code and Sections 37.001 *et seq*. thereunder, in a case of actual controversy within the Court's jurisdiction, for a declaration of the rights and other legal relations of the parties to an insurance policy.

2.      In this case a fraudster, yet unidentified, pretending to be a customer of the insured, ordered goods from the insured, on credit terms, which goods were shipped to the Port of Mombasa, Kenya, and from there, disappeared. The reason that the subject claim is not covered and thus not payable under the subject credit insurance policy is that the claim arises from identity theft and fraud, which is not the type of risk the subject policy (or any credit insurance policy) covers. Such claims are outside of the insuring agreement of the ***Policy***, and also, the claim is excluded because it involves a "***Disputed***" receivable, as more fully stated below.

The Parties: The Insurer (Euler) and the Insured (Polyindex)

3.      The insurer here, Euler Hermes North America Insurance Company ("Euler"), is a corporation incorporated under the laws of the State of Maryland and has its principal place of business at 800 Red Brook Boulevard, Owings Mills, Maryland 21117-5155. Founded in 1893, it is licensed and authorized to do an insurance business in various States including the State of Texas (License No. 96108), under the auspices of the Texas Department of Insurance, and its policy provisions have been approved by such Department. It is a leading issuer of trade credit insurance.

4.      The insured here, Polyindex, LLC ("Polyindex"), is a limited liability company organized and existing under the laws of the State of Texas and has its principal place of business at 77 Sugar Creek Center Boulevard, Suite 600, Sugar Land, Texas 77478. Its registered

office for the service of process is CT Corporation System, 350 North Saint Paul Street, Dallas, Texas 75201. According to its Original Petition, it is "a U.S. based chemical/resin broker that sells chemical/resin all over the world" (Pet'n ¶ 7).

Subject Matter Jurisdiction

5.    Polyindex and Euler Hermes are of diverse citizenship within the meaning of 28 U.S.C. § 1332.

6.    Polyindex is "a Texas limited liability company with its principal place of business in Missouri City, Texas," as alleged in its Original Petition (Pet'n ¶ 2). Upon information and belief, all of Polyindex's members are citizens of Texas. As a result, Polyindex is a citizen of Texas for purposes of 28 U.S.C. § 1332(c)(1).

7.    Euler is incorporated and has its principal place of business in the State of Maryland and as such is a citizen of that State, for purposes of 28 U.S.C. § 1332(c)(1).

8.    The amount in controversy, exclusive of interest and costs, is alleged to exceed $75,000.

Venue

9.    Under 28 U.S.C. § 1391(b)(2), venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. It is also the district in which Polyindex "resides" and in which Euler is subject to the Court's personal jurisdiction, under 28 U.S.C. 1391(c)(2).

Credit Insurance Generally

10.    Trade credit insurance, also sometimes called accounts receivable insurance, is a species of commercial insurance that protects a business when a credit-approved customer

(referred to as a "*Buyer*") fails to pay a legitimate, undisputed trade debt, on account of policy-defined *credit* risks, such as insolvency. *However, credit insurance does not insure against other types of risks, such as fraud or identity theft*, though these may result in unpaid invoices and losses. As with any insurance, the unambiguous terms, conditions and limits of the insurance policy govern whether and to what extent there is or is not coverage for a particular claim, and in this case establish that there is and can be no such coverage.

<u>The Credit Insurance Policy Here</u>

11.    On or about August 1, 2020, on application of Polyindex, Euler issued to Polyindex, and it accepted, a policy of trade credit insurance called a "Corporate Advantage Policy," designated as Policy No. 5127814, for a "*Policy Period*"[3] and an "*Insurance Contract Period*"[4] from August 1, 2020 through July 31, 2121 (the "*Policy*"). A copy the *Policy*—comprising declarations (called *Special Terms*), a policy form (No. GTC-001-US-EN V.1 (8/16)), specific Endorsements and the Application and any related supporting information provided by or on behalf of the insured—is annexed as Exhibit A and is incorporated by reference. Boldfaced, italicized and capitalized terms are terms that are defined in the *Policy*, which terms and definitions, likewise, are incorporated by reference.

---

[3]The "*Policy Period*" is the "period specified in the *Special Terms* included in an *Insurance Contract Period* [*see* n.4 below]." Policy Form § E (Definitions under your *Policy*") (at p. 12). The *Special Terms* are "the part of the *Policy* named the *Special Terms*," Policy Form § E (Definitions under your *Policy*") (at p. 11), the equivalent of a policy declaration. In the Policy, the *Policy Period* specified in the *Special Terms* is "August 1, 2020 to July 31, 2021."

[4]The "*Insurance Contract Period*" is defined as "the initial duration of the *Policy* and any subsequent periods of a duration specified in the *Special Terms* for which the *Policy* continues as set out in section 22.1.b." Policy Form § E (Definitions under your *Policy*") (at p. 11). In the Policy, the *Insurance Contract Period* specified in the *Special Terms* is "August 1, 2020 to July 31, 2021."

12.      The basic insuring agreement (coverage grant) of the **_Policy_** was as follows:

"[Euler] [will] cover you [Polyindex] for credit losses you sustain from unpaid insured

receivables" "in exchange for payment in full of all premiums due, and . . . subject to all the

terms and conditions of the **_Policy_**." Policy Form § A ("Scope of your _Policy_") (1) ("Insuring

agreement") (at p. 2). More specifically, "[t]he event of loss under the **_Policy_** will be when a

**_Buyer_**[5] fails to pay you an insured receivable for goods or services **_Supplied_**[6] because of one of

the following, whichever occurs first: a. The **_Buyer_** has become **_Insolvent_**[7] (the date of loss will

be the date of **_Insolvency_**); or b. A **_Protracted Default_**[8] has occurred (the date of loss will be the

expiration of the relevant **_Waiting Period_**)[9]." Policy Form § A ("Scope of your _Policy_") (2)

("Event and date of loss") (at p. 2).

---

[5]A **_Buyer_**, basically, is a specific, credit-approved customer of the insured, and, by definition, must be "a legal entity, and its branch offices, trade styles or divisions, to which you [the insured] have **_Supplied_** the goods or services and which is responsible for the payment of the related invoice and which is domiciled in any of the countries specified in the **_Special Terms_**.")." Policy Form § E ("Definitions under your _Policy_") (at p. 10). Euler undertakes to credit-evaluate business entities, on an ongoing basis.

[6]**_Supplied_**, in the case of goods, means that "[t]he goods have been passed to the first independent carrier for transport to the place where the **_Buyer_** is obliged to accept them" or "[i]f there is no independent carrier, the goods have been deposited into the possession of the **_Buyer_** or a third party agent who agrees to hold the goods to the order of the **_Buyer_**." Policy Form § E ("Definitions under your _Policy_") (at p. 12).

[7]**_Insolvecy/Insolvent_** basically means bankruptcy filing, receivership and equivalents, variously, as enumerated in Policy Form § E ("Definitions under your _Policy_") (at p. 11). (This does not come into play in this case.)

[8]A **_Protracted Default_** is "the non-payment at the end of the **_Waiting Period_** of all or part of an insured receivable by a **_Buyer_** that is not **_Insolvent_**." Policy Form § E ("Definitions under your _Policy_") (at p. 12).

[9]The **_Waiting Period_** is "the relevant period specified in the **_Special Terms_** which starts from the original due date of a receivable." Endorsement C10-003-O/V.1 (7/18). The **_Waiting Period_** in the **_Special Terms_** of the **_Policy_** is based on the particular country in which a **_Buyer_** is located. For example, for a **_Buyer_** located in the United Kingdom, the **_Waiting Period_** is "90 Days," Special Terms p. 3, starting from the original due date of the receivable.

<u>Particular Conditions for Coverage of a Receivable: The Goods Must Be **Supplied** to the **Buyer**</u>

13.    For a receivable to be "insured" under the **Policy**, it must "relate[] to goods or services **Supplied** by [the insured] or on [its] behalf during a **Policy Period.**" Policy Form § A ("Scope of your **Policy**) (3) ("Insured receivable") (b) ("A receivable resulting from goods or services **Supplied** . . . is insured if . . . [t]he receivable relates to goods or services **Supplied** by you [the insured] or on your behalf during the **Policy Period**.""). Goods are "**Supplied**" when they "have been passed to the first independent carrier for transport to the place where the **Buyer** *is obliged to accept them*." Policy Form § E ("Definitions under your *Policy*") (at p. 12) (emphasis added).

14.    Conversely, if the goods are **Supplied** to someone *other than* the actual **Buyer**, there is and can be no coverage under the **Policy** for any unpaid receivable arising therefrom.

15.    Once issued, for the **Policy** to cover the insured's receivables from a given **Buyer**, the insured first "need[s] to request and obtain from [Euler] or the Risk Service Provider[10] a **Permitted Limit**[11] on that **Buyer** using [Euler's] online information system[12] or in writing." Policy Form § B ("Managing your *Policy*") (7) ("Your *Permitted Limits*") (7.1) ("Setting your

---

[10]This is per Endorsement No. RISA-001-E/V.1 (8/16) entitled "Risk Information Services Endorsement," which sets out how Euler, as Risk Service Provider, agrees to provide Polyindex with certain "Risk Information Services" described in the Endorsement.

[11]A **Permitted Limit** (sometimes referred to as an Approved Limit), is "the maximum amount of credit and the specific conditions for which a **Buyer** is covered either as specified in the **Permitted Limit** Endorsement issued by [Euler] . . . or qualified per the Discretionary Limit Endorsement, if added to the Policy." Policy Form § E ("Definitions under your *Policy*") (at p. 12).

[12]Euler's online information system is known as "EOLIS," to which insureds are given access to manage their policies and through which to apply for **Permitted Limits** for their customers. Polyindex had access to this system in connection with the **Policy**.

*Permitted Limits*") (a).[13] In that process, Euler "underwrites" the creditworthiness of ***Buyers***, including investigation and monitoring of the credit risk of ***Buyers*** for the management of the Policy.

The ***Buyer*** (Hammond Chemicals Limited) and Its ***Permitted Limit***

16.    Polyindex sought to do business with a customer called Hammond Chemicals Limited, a business located and operating at one site in the United Kingdom, at Canal Street, Brierley Hill, West Midlands DY5 1JR, United Kingdom, as a wholesaler of chemical products that supplies industrial and blended solvents to a wide variety of industries.[14]

17.    Since approximately October 27, 1969, Hammond Chemicals Limited has been a Private Limited Company incorporated under the laws of the United Kingdom, and a legal entity thereunder.

18.    On or about July 29, 2020, Polyindex made a Credit Limit Request to Euler for "HAMMOND CHEMICALS LIMITED CANAL STREET BRIERLEY HILL DY5 1JR United Kingdom" as a ***Buyer***, requesting a ***Permitted Limit*** of $400,000.

19.    On July 29, 2020, Euler issued Limit Endorsement No. 00000002 for the ***Policy***, for an "Approved Limit" (a ***Permitted Limit***) of USD 400,000 for Hammond Chemicals Limited

---

[13]Under the ***Policy***, Euler may "at any time withdraw, reduce or modify a ***Permitted Limit*** by issuing a ***Permitted Limit*** Endorsement," which "will take effect for goods or services ***Supplied*** on and after the date of our Endorsement." Policy Form § B ("Managing your *Policy*") 7 ("Your *Permitted Limits*") 7.3 ("Amendments to your *Permitted Limits* and country cover") (b).

[14]According to Polyindex's Original Petition, it "was contacted on or about June 20, 2020 by Hammond Chemical LTD (HCL)," "a U.K. based company that was seeking to purchase $176,000.00 of product from POLYINDEX." Pet'n ¶ 8. Polyindex asserts that it sought coverage under the ***Policy*** for Hammond Chemicals Limited as a ***Buyer***, through a ***Permitted Limit*** of $400,000. Such limit was accorded for Hammond Chemicals Limited as a ***Buyer***.

as a **Buyer**, to "start[] on the effective date stated in [Polyindex's] **Policy**, *i.e.*, August 1, 2020.[15] (This Endorsement is included with the annexed copy of the **Policy**.)

20.    Under the **Policy**, on its part, Polyindex was affirmatively responsible for ensuring that Hammond Chemicals Limited, as "the **Buyer** named in [Euler's] **Permitted Limit**," was "the same legal entity to which [Polyindex] invoice[d] the goods" as the entity to which it "**Supplied**" such goods. Policy Form § B ("Managing your *Policy*") (7) ("Your *Permitted Limits*") (7.1) ("Setting your *Permitted Limits*") (e); § E ("Definitions under your *Policy*") (at p. 12). To be covered, Polyindex could not **Supply** the goods to someone other than the actual **Buyer**.

The Fraudulent "Purchase" By Someone Impersonating the **Buyer**

21.    Upon information and belief, in or about June-August 2020, a fraudster posing as "Hammond Chemicals Limited," but having no affiliation with the actual **Buyer** Hammond Chemicals Limited, appropriated its business identity and purported to order goods through Polyindex—220 metric tons of "PET PRIME RESINS SHINPET 5015W-IV.0.80"[16]—for shipment by sea from Taiwan CIF to the Port of Mombasa, Kenya, on credit terms.

22.    To accomplish this, the fraudster issued to Polyindex a would-be signed "Hammond Chemicals Limited" "PURCHASE ORDER" No. HC/LTD/1621/20 dated August 4, 2020 for such goods, for a price of US $ 176,000.00, to be shipped to "HAMMOND

---

[15]Later, by Limit Endorsement No. 00000005 dated January 23, 2021, the **Permitted Limit** for Hammond Chemicals Limited as a **Buyer** was withdrawn "as to any future **Supply**," as Euler was permitted to do under the **Policy**. *See* Policy Form § B ("Managing your *Policy*") 7 ("Your *Permitted Limits*") 7.3 ("Amendments to your *Permitted Limits* and country cover") (b). (The Endorsement is included with the annexed copy of the **Policy**.) This does not have a bearing on the subject claim.

[16]This is a type of plastic resin pellet used for blow molding, produced by Shinkong Fibers Corporation in Taiwan, which Polyindex brokered. "PET" stands for polyethylene terephthalate (a plastic polymer) typically used in producing plastic containers.

CHEMICALS LIMITED PLOT 55 BOMBO RD KAWEMPE KAMPALA UGANDA EAST AFRICA," CIF Port of Mombasa, Kenya and billed to "HAMMOND CHEMICALS LIMITED CANAL ST, BRIERLY HILL WEST MIDLANDS DY5 1 JR UNITED KINGDOM," the latter being the address of the "real" Hammond Chemicals Limited (which had no involvement in the transaction). Polyindex accepted the PURCHASE ORDER.

23.    Polyindex sourced the goods in Taiwan, and on or about August 23, 2020, through an independent carrier (Hapag-Lloyd AG, a shipping company based in Hamburg, Germany), Polyindex effected shipment of the goods (200 bags of plastic resin) by ship from Kaohsiung, Taiwan to "Hammond Chemicals Limited," as consignee, CIF, to the Port of Mombasa, Kenya, in accordance with the "PURCHASE ORDER."

24.    On or about August 28, 2020, Polyindex then invoiced the "real" Hammond Chemicals Limited for US $176,000.00 for the goods, via its Invoice No. IN082820-01, referencing PO No. HC/LTD/1621/20, under which payment would be due October 22, 2020 (60 days from the bill of lading date).[17]

25.    According to Hapag-Lloyd AG's (the carrier's) Shipment Tracker, https://www.hapag-lloyd.com/en/home.html, the goods were discharged in Mombasa Kenya on or about September 17, 2020. (It is not known what happened to them from there.)

26.    As it turned out, the person or entity to which Polyindex had "*Supplied*" the goods was not the same legal entity (Hammond Chemicals Limited) that Polyindex invoiced for the goods, but rather, was a fraudster.

---

[17]This was subject to a "***Waiting Period***" of 90 days. *See* n.9 above.

27.     On its part, the would-be **Buyer** (Hammond Chemicals Limited) was not obliged to accept any such goods much less pay for them, as it had not ordered any goods from Polyindex, nor it was the author of the "PURCHASE ORDER," which was a fake.

28.     In **Policy** terms, the goods were not **Supplied** to the actual **Buyer** (Hammond Chemicals Limited) in that they were not "transport[ed] to the place where [Hammond Chemicals Limited was] obliged to accept them" so as to constitute an "insured" receivable. Policy Form § A ("Scope of your *Policy*) (3) ("Insured receivable") (b); § E ("Definitions under your *Policy*") (at p. 12).

29.     Also, the real Hammond Chemicals Limited (as opposed to the fraudster) was not the "legal entity, and its branch offices, trade styles or divisions, to which [Polyindex] ha[d] **Supplied** the goods" and was not "responsible for the payment of the related invoice." Therefore it was not actually the "**Buyer**" of the subject goods for purposes of the **Policy** (*see* Policy Form § E ("Definitions under your *Policy*") (at p. 10)).

30.     And on its part, despite having shipped and invoiced such goods, Polyindex had not ensured that the entity that it invoiced for the goods, Hammond Chemicals Limited ("the **Buyer** named in [the] **Permitted Limit**") was the same entity to which it "**Supplied**" the goods in Mombasa, Kenya, thereby breaching Polyindex's affirmative obligation under Policy to ensure that they were one and the same. *See* Policy Form § B ("Managing your *Policy*") (7) ("Your *Permitted Limits*") (7.1) ("Setting your *Permitted Limits*") (e); § E ("Definitions under your *Policy*") (at p. 12). Whoever the goods were shipped to in Mombasa, it was not the **Buyer**.

31.     Upon receipt of the "invoice," Hammond Chemicals Limited disavowed having ordered any such goods, or having any location in Africa, and disputed that any amounts were owing. Polyindex confirmed that the real Hammond Chemicals Limited never received (nor had

ordered) any of the goods and thus had no obligation to accept or pay for them, so the "invoice" was not paid.

32.     In September 2020, Hammond Chemicals Limited reported the fraud to the United Kingdom's National Fraud Intelligence Bureau (NFIB).

33.     The actual identity of the fraudster has not been determined, and the fate of the goods has not been accounted for.

34.     Thus, under its insuring agreement, the **Policy** does not cover the **Buyer**'s non-payment for the goods since it was not obliged to pay for any such goods, nor had it been **Supplied** with any such goods. Simply put, the **Policy** does not insure fraudulent transactions, nor does credit insurance generally.

35.     On its part, Euler has performed all of its material obligations under the **Policy**, in good faith, and it has satisfied any applicable conditions precedent as to it *vis-à-vis* the **Policy.**

The Receivable for the Goods is *Disputed* and Therefore Excluded from Coverage

36.     In addition to its insuring agreement, the **Policy** also provides that "a receivable resulting from goods . . . **Supplied** is not insured . . . [i]f the obligation to pay the receivable . . . [h]as been **Disputed** by the **Buyer**." Policy Form § A ("Scope of your *Policy*") (4) ("Uninsured receivable") (4.1(c)). "'**Dispute**'/'**Disputed**' means any unresolved disagreement between [the insured] and a **Buyer** that results in the **Buyer** refusing to pay [the insured] all or part of any receivables." Policy Form § E ("Definitions under your *Policy*") (at p. 11). In such event, there remains no coverage unless and until "the **Buyer**'s liability is established by agreement in writing

-19-

or by a final binding court judgment or arbitration award" and such "court judgment must be obtained in a jurisdiction in which the **Buyer** has a majority of its assets." *Id*.[18]

37.     Polyindex's receivable has been **Disputed** by <u>Hammond Chemicals Limited</u>, *i.e*., it has refused to pay Polyindex all or any part of any receivables reflected in the invoice and has disavowed any obligation to do so, because it did not order the goods.[19]

38.     Therefore, the receivable represented by the invoice is **Disputed** and thus not insured under the **Policy**.

39.     Any liability on the receivable has not been "established by agreement in writing or by a final binding court judgment [in a jurisdiction in which [<u>Hammond Chemicals Limited</u>] has a majority of its assets] or arbitration award," none of which Polyindex has sought, nor would have a basis to seek against the actual **Buyer** <u>Hammond Chemicals Limited</u>.

40.     This is an independent ground for non-coverage under the **Policy**.

<u>Polyindex's Policy Claim and Euler's Denial of Coverage</u>

---

[18]If an invoice is **Disputed**, any claim is suspended until it is no longer **Disputed**. The Policy provides: "If any part of your [the insured's] receivable was **Disputed**, we [Euler] will recalculate your **Claim Payment** . . . when it is no longer **Disputed**. This will happen upon our receipt of evidence that the **Buyer**'s liability has been established by agreement in writing or by a final binding court judgment or arbitration award. We will make any additional **Claim Payment** due to you within 30 days from the date you provide us with such evidence. Final binding court judgment must be obtained in a jurisdiction in which the **Buyer** has a majority of its assets." Policy Form § C ("Claims and Debt Collection") (11) ("*Claim Payment*") (11.4) ("Making your Claim Payment") (b).

[19]<u>Hammond Chemicals Limited</u> apparently has been the target of "phishing" scams. On its <u>website</u>, it has posted: "**WARNING! Be wary of phishing emails trying to purchase goods in our name for delivery to other locations . . . .** Be aware of phishing email fraudsters, trying to purchase goods on credit in our name. We only operate from one site at Brierley Hill in U.K. We do not have any foreign operations. . . ."

41.    On or about January 11, 2021, Polyindex filed a **Claim and Collection form**[20] with Euler under the ***Policy***, of which Euler promptly acknowledged receipt, promptly began its investigation of the claim, requested all items, statements and forms that the Euler reasonably believed, at that time, will be required from the claimant,

42.    In the course of Euler's investigation of the claim, on January 22, 2021, Hammond Chemicals Limited, by its principal Shaun Hammond, confirmed that the transaction was fraudulent, and that it was not obligated for the payment of the related invoice.

43.    On March 10, 2021, following investigation, Euler promptly and timely notified Polyindex of its determination that the claim was not covered under the ***Policy***, for the primary reason that, through an additional claims/collection investigation, the claim was found to be a fraudulent purchase.

44.    Euler also invited Polyindex to provide any additional documentation that could substantiate coverage, but Polyindex did not provide any such documentation.

Count I: Claim for Declaratory Relief under the Declaratory Judgments Act/Fed. R. Civ. P. 57

45.    There is an actual, justiciable controversy between Euler, on the one hand, and Polyindex, on the other hand, regarding Polyindex's claim under the ***Policy*** and coverage *vel non* therefor. A declaratory judgment is appropriate as it will terminate the controversy giving rise to this proceeding.

46.    The Petition includes allegations that: (1) the insured is entitled to benefits under the ***Policy***; (2) Euler is liable for such benefits; (3) the insured claimed policy benefits; and (4)

---

[20] "***Claim and Collection form***' means our [Euler's] form, completed using our online information system or in writing, by which you [the insured] notify a claim to us and authorize us, a Euler Hermes Group affiliate, or other third party appointed by us to collect the debt. The ***Claim and Collection form*** specifies the supporting documents which you need to provide to us on filing."  Policy Form § E ("Definitions under your *Policy*") (at p. 11).

the insurer has refused to pay; all of which Euler disputes. Therefore this action is ripe for declaratory relief.

47.      Euler is entitled to the declaration that there is no coverage under the **Policy** for the subject claim of Polyindex, as more fully appears above.

Count II: Remedies for Frivolous Action By Polyindex

48.      Under Section 541.153, Subchapter D, Chapter 5, Subtitle C of Title 5 of the Texas Insurance Code, a court shall award to the defendant court costs and reasonable and necessary attorney's fees if the court finds that an action under such Subchapter is groundless and brought in bad faith or brought for the purpose of harassment.

49.      Polyindex's action is groundless and brought in bad faith and/or for the purpose of harassment. Polyindex's claim, and its action are barred by the unambiguous terms of the Policy, which are presented in detail above, and called to the attention of Polyindex and its counsel. Demand is made that Polyindex withdraw its claims under the **Policy** and as alleged in the Petition.

50.      If the claims are not immediately withdrawn, and this action continued, Euler claims entitlement to an award of court costs and reasonable and necessary attorneys' fees in connection with this action under Section 541.153 of the Texas Insurance Code.

51.      **Demand for Judgment**: Defendant/counterclaimant Euler Hermes North America Insurance Company demands judgment and decree against plaintiff/counterclaim defendant Polyindex, LLC dismissing its claims with prejudice, awarding costs, and declaring the rights and other legal relations of the parties, pursuant to 28 U.S.C. §§ 2201-02, Fed. R. Civ. P. 57, to the effect that under the terms and conditions of the subject **Policy**, the insurer, Euler, is not required to indemnify the insured, Polyindex, for its claim arising from its shipment of goods

to "Hammond Chemicals Limited," which was not a **Buyer** under the **Policy** but rather an imposter operating a phishing scam and posing as a **Buyer**; awarding Euler court costs and reasonable and necessary attorneys' fees under Section 541.153, Subchapter D, Chapter 5, Subtitle C of Title 5 of the Texas Insurance Code, upon a finding that Polyindex's action is groundless and brought in bad faith or brought for the purpose of harassment. Euler seeks further relief based on a declaratory judgment or decree as necessary or proper, which Euler seeks hereby and/or by petition to a court having jurisdiction to grant the relief.

Dated: January 13, 2022                      Respectfully submitted,

_/s/ James Craig Orr, Jr._
James Craig Orr, Jr.
Texas Bar No. 15313550
jim@hop-law.com
HEYGOOD ORR & PEARSON
6363 North State Highway 161
Suite 450
Irving, Texas 75038
(214) 237-9001

Andrew P. Saulitis
NYS Bar No. 1702950
Attorney-in-Charge
(*pro hac vice* admission pending)
Neal W. Cohen
NYS Bar No. 2720191
(*pro hac vice* admission pending)
HALPERIN BATTAGLIA BENZIJA, LLP
40 Wall Street –37th Floor
New York, New York 10005
(212) 765-9100
Fax:  (212) 765-0964
apslaw@msn.com
ncohen@halperinlaw.net

*Attorneys for Defendant*
*Euler Hermes North America Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 13, 2022, a true and correct copy of the foregoing document has been served upon all counsel of record via email in accordance with the Federal Rules of Civil Procedure:

Chadrick S. Henderson, Esq.
HENDERSON LAW GROUP, PLLC
2646 S. Loop W. Suite # 380
Houston, Texas 77054
chadhendersonlaw@yahoo.com

*/s/ James Craig Orr, Jr.*
James Craig Orr, Jr.